Thank you. I'd like to reserve two minutes for rebuttal. Good morning, and may it please the court, my name is Mike McMorrow, and I'm here today representing the plaintiff, Tracie Thomas, in this appeal. This case arises under the Telephone Consumer Protection Act, 47 U.S.C. 227, and is the result of a spam text message campaign by Taco Bell and its local marketing association, the Chicago DMA. Now, this case has a somewhat unusual background. After the district court reversed itself, the plaintiff's lawyer, and granted summary judgment to Taco Bell, and after we filed our opening appellate brief, the FCC came out with an order that's directly on point with this case, and which rejects the district court's limited application of vicarious liability as being contrary to the federal common law that should be applied in TCPA cases. As we set forth in our briefs, the district court erred on multiple levels. In misapplying this circuit's vicarious liability standard from U.S. v. Bonds, and in Before we get to vicarious liability, because I know that's where the majority of the argument is, and that's where the majority of what's been said, I guess I'm wondering about the direct liability. It seems to me you've waived that. I don't think I have, Your Honor. The first time that we briefed summary judgment in this case, in early 2012, we argued at length the issue of direct liability as well as the issue of vicarious liability. And although the district court, in ruling on that motion, denied summary judgment, the district court said at that time that it didn't think direct liability was appropriate and that vicarious liability was the appropriate standard here. When the defendant convinced the district court to give them another shot at briefing the vicarious liability issue, the district court ordered briefing solely on that issue. Well, as I saw, and I read the status conference, it seems to me the district court said, I don't see the defendant being directly liable. They didn't send a message, so don't need to, at least in my mind, we don't need to address that. Defense counsel, you're absolutely right. Plaintiff's counsel, nothing. Well, Your Honor, we did raise the issue, and we incorporated it. Well, you haven't raised the issue since. I mean, the bottom line is, is then we go to the fourth summary judgment. Plaintiff doesn't respond to the direct liability part of the motion, only to put in a footnote all the arguments are incorporated, and the court rules on vicarious liability, and now I've got that in front of me. Well, and the court also, Your Honor, did rule on direct liability. The court said that plaintiff can't be seeking direct liability. The court's order doesn't talk about direct liability. I believe the court's order does, Your Honor. What does it say? I mean, if you just refer me to the page, I'll read it. It's page 8 of the court's order. Okay. I'll look at it. Thank you, Your Honor. As you mentioned, the large part of the argument here is about vicarious liability. And as we said — And I wanted you to have your major time on that, but that's why I wanted to get that out of the way. Thank you, Your Honor. And as we set forth in our briefs, the district court erred on multiple levels, both in misapplying this court's vicarious liability standard from bonds and in ignoring evidence in the record that should have created a triable issue. on either direct or vicarious liability against Taco Bell. As the evidence showed, Taco Bell required sole control over all of the advertisements from the Chicago DMA. And the evidence shows that control through Taco Bell's votes on the campaign, its approvals on the campaign, and its oversight of the DMA and its payment for the campaign after it was conducted. The FCC order further confirms this erroneous analysis by the district court and clarifies the proper analysis for vicarious liability under the TCPA. You've got to convince me that I have to give any deference to the FCC on parent authority or ratification. Your Honor, I think — I mean, to me, I give deference to administrative agencies with caution. I don't like it. I don't want them telling me too much about it, so I read the statute to see whether I have to. And I read Chevron to say, but in this particular situation, the TCPA allows for private rights of action. And under the private rights of action, those are adjudicated by the judiciary. Yes, Your Honor. And so in my book, the standards relating to apparent authority and ratification seem to be something that judges ought to decide, not the FCC. And I agree, Your Honor. I'm not here to tell you that this is something that the application of the apparent authority and ratification standards is something that — I sound pretty definite, but what I'm trying to do is just present the issue to you square. Yes, Your Honor. Because the bottom line is, I don't see it as the exclusive province of the FCC, and so therefore, I don't have to give them any deference at all. I just go do the issue. And to the extent that the court considers itself bound by what — by the standards of ratification and apparent authority, it's because that's what federal common law says. And I think to the extent that the FCC order says you apply federal common law as to vicarious liability, then I think that would be entitled to Chevron deference. But you're absolutely right, Your Honor. I think application of that standard to ratification and apparent authority is something that the court doesn't need to give Chevron deference to. I think if the FCC were here today as they were in the appeal to the D.C. Circuit in that case, I don't think they would even argue that Chevron deference applied to that — to the application of those standards. However, I would say there are — to the extent that it's able to persuade this court, it should be entitled to a lower Skidmore level of deference. And I think it would be appropriate if the court — I think it would be appropriate for the court to give a Skidmore level of deference to the FCC because the FCC considers these issues of the relationships between telemarketers and the principals very frequently. And they have a sound basis for doing so. But I wouldn't say that the court — I wouldn't say that the court is bound by that. But I would say that it has the power to persuade, and I think it is persuasive in this case. I don't quite understand what you're saying. I mean, the FCC said that you apply — that in addition to the classical agency standards, you applied apparent authority and ratification. And what is it that you say is entitled to Skidmore deference? Well, I think their discussion of what the federal common law is is entitled to or could be given a lower level of deference by this court. But obviously this court is perfectly capable of deciding what the federal common law of agency is for itself. No, there was a federal common law. Well, according to most of what I've read, the federal courts generally follow the restatement of agency as setting forth the federal common law of agency. My understanding of the concept of apparent authority is that it includes a reliance factor. That is, somebody deals with you in the belief that X is your agent because you've cloaked X with certain powers, an office, whatever. Exactly right. And the person who dealt with X relies on that. I don't see that here at all. Well, I think, Your Honor, it does apply here, and I think it would apply here. I'm not saying that the concept per se is not applicable. The district judge, in fact, the FCC cited the district court judge's opinion in this case for saying that he understood the vicarious liability applying. But what is it about apparent authority that's applicable here? It's Taco Bell allowing its agents to use Taco Bell's trademarks and trade names. Let's assume that all of your descriptions are correct. Where is the reliance? In other words, I've always thought of the adoption of apparent authority as a kind of estoppel, that you have cloaked somebody who doesn't really have authority with authority, and another person acts to his or her detriment in reliance. And I don't see that in this case. And I was just the ñ where is it here? Well, as I said, Your Honor, I think it's apparent here, because Taco Bell has given its agents the right to use Taco Bell's ñ But where is the reliance? Let's assume that you meet the standard for cloaking somebody with what would otherwise constitute apparent authority. Where is the detrimental reliance that would trigger the estoppel? That's part of the doctrine of apparent authority. Well, I think of apparent authority as just ñ and this is also what the FCC said about apparent authority. It's when the agent gives a third party or the apparent agent gives a third party a reasonable belief that is traceable to a manifestation of the principle. That's part of it, but it's always in the context of somebody relying on it. And I think Ms. Thomas here relied on that when she testified that she thought that the message came from Taco Bell. I don't understand that. She relied on it because she thought the message came from Taco Bell. Well, she didn't rely on it, Your Honor. And you're saying that it did. I'm sorry, Your Honor? You're saying that it did. I mean, I don't quite understand what her reliance to her detriment was. Well, she didn't ñ So she thought it came from ñ you're saying ñ and you're losing ñ I'm not saying that she took any steps to her detriment in reliance on the message. What I'm saying is that the message that was conveyed to her by Taco Bell's agents gave her a reasonable indication that Taco Bell had authorized this message to be sent. So why? Well, that gets to the standard of vicarious liability, Your Honor. The standard of vicarious liability from U.S. v. Bonds, even aside from concepts of apparent authority and ratification, is that the principle either controls or has the right to control the agent. And by giving its agents the ability to use Taco Bell's trademarks and trade names, Taco Bell gave Ms. Thomas and the other people who received this text message the understanding that they were authorized to send this message on behalf of Taco Bell. And, in fact, they were authorized to send this message. What is the plaintiff's understanding of this relevant to? The issue of whether Taco Bell is liable is on the reading of the statute and whether or not this text message was sent and whether Taco may somehow have been responsible. But what is the recipient of the call's state of mind relevant to? It wasn't false. I mean, she could have won whatever it is, the sweepstakes that they were using as a sales device. Why is it relevant? What your client thought about whether it came from Taco Bell or not? It's relevant only what my client thought is relevant only to the question of apparent authority. It's not relevant to the question of whether Taco Bell actually had the right to control its agents. That's a separate question. It's relevant only to apparent authority. I see my time's running short. Counsel, Judge Gould, a quick question. What did your client do, if anything, in reliance on getting the message and thinking it was authorized by Taco Bell? Well, she didn't take any steps in reliance on the message in the sense that she didn't go to Taco Bell. She went to see a lawyer. Well, she did go to see a lawyer about it, but she didn't go to Taco Bell and enter the contest. She didn't text back into the campaign. So she didn't take any other steps directed towards Taco Bell in reliance on this message. And do you disagree with what I thought was the least implicit suggestion of Judge Corman, that apparent authority would require some degree of reliance? Like I said, Your Honor, I think the question of apparent authority doesn't necessarily require reliance in a situation like this. It's a question of what the principle here at Taco Bell, what it allowed the public to think, the recipient of the message to think, in this case my client, about the authority of its agents. And, in fact, that was borne out. Those agents did have the authority that was implied. They had actual authority in addition to the implied authority. Thank you, counsel. And since I used up some of your time at the end, I will ask my colleague, Judge Smith, to give you a little rebuttal time, even though your time is up. I appreciate that, Your Honor. Thank you very much. You can tell he's the presiding judge. Good morning, Your Honors. May it please the Court, Karen Baumholtz for the respondent, Taco Bell Corp. I'd like to start today by just addressing some big overarching points, and then I want to move to talking about what standards actually apply here, and then get into this actual record. In her brief, and you heard a little bit about it in the argument here, the appellant here made much of the fact that the district court initially granted this summary judgment motion and then denied it and then later granted it. That doesn't tell you that the district court was wrong. What that tells you is it's very easy to look at this body of case law, see the word Taco Bell, see something about nachos, steak nachos and chicken nachos, and say, well, there must be an issue of fact in there about whether Taco Bell had something to do with this. To be fair, you really don't need to give credit to the district court for denying, then granting, then denying. We might have been there before ourselves once in a while. We've denied and then granted and then denied. So that's not a big deal. The big deal is the law. Did he get it right the second time? That's the question. And the answer is yes. The big deal is the law and this record. And this actual record just doesn't support any reasonable finding that anyone in this whole chain of actors was Taco Bell's legal agent. Let me start with the statute, as the courts recognized all morning. That is where we start. The statute that's at issue here prohibits the making, to make, any call using any ATDS to call a cell phone. And I emphasize the word to make because that's different from what you see in a lot of the other case law and that's different from what was at issue in the FCC's declaratory ruling. What was at issue there was a different subdivision that makes it unlawful to initiate a call, which is a seemingly broader verb. And I want to focus on that as I walk through what standards apply. Now, I think direct liability, I think the court is right that this really was not briefed in connection with the order that gave rise to the summary judgment. The plaintiff made an election not to address that issue. But direct liability under this statute, plain reading of this statute doesn't get you there. I don't want to spend a lot of time on this, but I would just ask the court to look at the plaintiff's complaint, which is at ER 310, paragraph H. The plaintiff alleges that Ipsh directed both SMS blasts to be transmitted. Taco Bell Corp. did not make this call. The association did not make this call. There's a whole chain of people. So I don't want to spend a lot of time on direct liability unless the court has questions. But Satterfield tells us if it's unambiguous, you stop. Now, the plaintiff spent some time in the briefing talking about this concept of on behalf of liability. If the text message could be shown to be sent on behalf of, then somehow that would put liability on a third party. Well, ultimately, I think that collapses vicarious liability standards, and so it really isn't going to make a difference in this case. I read the FCC rulings, but I thought that they ruled that on behalf of doesn't really apply to the direct. The FCC did rule that, and I think that's exactly right. There isn't on behalf of doesn't appear in this subdivision of the statute. It appears elsewhere in the statute where you deal with the do not call registry provisions. It doesn't appear here. So you're falling back to traditional notions of vicarious liability. Now, I would submit that because the statute that we're dealing with uses the verb to make a call, as opposed to initiate, which is used two subdivisions later. There's actually a reasonable argument here that Congress maybe even intended not to allow vicarious liability of any sort, and we've never stretched that far in our argument for purposes of this motion, but surely those traditional standards have to apply. So what's the standard? It's traditional agency. You can look to the Supreme Court's decision in Meyer. You can look to the restatement. You can look to this court in Bonds. It requires the principal's assent, in the context of this case, Taco Bell's corpse consent to agency, of who we're going to talk about in just a minute. There's a whole line of actors, like I mentioned. The principal's right to control. The agent acting on the principal's behalf or for their benefit. The fact that there's some contract out there and the restatement tells you this. Control, however defined, is insufficient by itself to establish agency. You don't say, well, I've got a contractual right to control the use of my name and my marks, and that's enough to say that an association or IPSH or the vendor who sent this text message is out there being my legal agent allowed to act on my behalf. That's not agency. We're talking about that legal relationship, and the plaintiff misses that every time they talk about different case law or the facts of this case. So with that standard in mind, let's talk about this record for a minute. I know the court's familiar with the record, but there are a few pieces that get a little mushy in the briefing, and I want to make sure we're clear. IPSH, a company called IPSH, hired a vendor to send the text messages that are at issue here. That's in plaintiff's complaint. There's no dispute. IPSH was hired by ESW, an advertising agency with whom my client, Taco Bell Corp., does not have a relationship. The undisputed record is the Chicago Association, which is an independent registered corporation in Illinois with 12 independent members and four different directors have the relationship with the ad agency. The association has its own director. Susan Vitti is a Taco Bell employee. She also is a director on a board called the Chicago Association. That does not, we've given you the case law, the restatement tells you, a director being on a board does not make an employer viable. As long as we're talking about evidence, is there any evidence that either the vote of a director or a representative of Taco was needed in order to do the promotion? Is there any evidence? No, Your Honor. In fact, the Taco Bell, the membership of Taco, here's how it worked. Each director has a vote. There are four directors on the Chicago Association. One of them is Susan Vitti. She is a director, independent. She is not a director for Taco Bell. Taco Bell appointed her because Taco Bell had the right to do that as part of the association's bylaws. Three other directors. I understand your point, but I don't understand when you say she's independent. She's on that board because Taco Bell wanted her to be on the board. I understand the argument she was only one out of four, and that may not make Taco Bell viable, but I don't understand your argument about independent, close quote. Well, she owes independent fiduciary duties as a director. I mean, I may serve, I may be an employee of my law firm, and I may serve on the board of directors of various other organizations because my law firm encourages me to do that, but that does not mean that when I act on behalf, in my capacity, in my role as a director for that independent corporation, that I am acting for Taco Bell Corp. or anyone else. So then your answer to my question is no, because, as I understand the evidence, there is no evidence that a vote of a director appointed by Taco Bell or either a representative of Taco Bell is needed to do the promotion. That is exactly right. In fact, if your representative were not in the majority or didn't represent a majority of the membership at all, then there wouldn't be any agency either, correct? I thought you were going to ask a different question. There wouldn't be any agency because Taco Bell does not control the association, and it's not just because there's only one board of director slot that's filled by Taco Bell. That's certainly one reason, but it's because Taco Bell hasn't said, I control you association. There's no, that we get back to that traditional agency finding or standard, and it doesn't apply. But yes, Your Honor, that's exactly right. Not only is the Taco, quote-unquote, Taco Bell Corp., and I say quote-unquote because it's not Taco Bell's vote on the board of directors. It's Susan Vitti with independent fiduciary duties under corporation law. Well, the only reason I put it in the way I did is because I think on summary judgment, I have to give the facts the most intendment toward the opposition. So it seems to me that what I was trying to figure out is, it doesn't seem to me that they've got to have a vote of the taco board director or representative. The taco board representative or member director doesn't have to be in the majority. They don't have to represent the majority. So at this point, they can act totally, even if she's the representative of Taco Bell, they can act totally against what she suggests. And not only that, but the undisputed record is that that happened on numerous occasions, that Susan Vitti voted against some promotion, a radio spot or a local coupon, and the board went ahead with it anyway. They have the right to do that. Now, the one thing I want to address, because I suspect that on rebuttal you're going to hear about it, and I know it's been a big deal in the briefing, there is a marketing fund policy that allows Taco Bell to approve local promotions. That's why I'm glad you got into that, because the next thing I was going to say, but Taco Bell did pay. Well, actually, Taco Bell didn't pay. Let's be clear about that, because the undisputed record on this is that when a local association like this is developed, and it's independent, I don't think there's any dispute about that, that it acts for its own benefit. It's local members, what they want to do to promote their stores. It acts for its benefit, not the benefit of my client, Taco Bell Corp. And if they'd like to set up an association and they'd like to have NAFA, which is a part of Taco Bell, but if they'd like to have NAFA administer marketing funds for them, they pay those funds in. And the reason why I say Taco Bell Corp. doesn't pay is not because I'm saying, well, NAFA pays. I'm saying that that money is the local association's money that is being managed by NAFA, and a certain percentage is set aside for local promotions. It is the association's money. Taco Bell did not pay for this. The association did. Can I ask you, as I understand it, the money is paid into this fund because Taco Bell Corp. directed that it be done. Well, not exactly. I know. Well, if I'm wrong, tell me. Not exactly. The reason why, I mean, a franchisee does not have to participate in this, right? The franchise agreements allow the franchisees to pool together, create a legal entity where they do their local advertising, and if they choose to participate under that fund, then there's amounts that can be paid in, and the marketing fund talks about how that will be managed by Taco Bell. So when you say Taco Bell directed that it be, oh, I'm sorry. You're saying that it be directed that the invoice be paid. No, I'm going to get to that. There are two issues. First, the fund and what percentage goes to, I think it was 3% goes to national advertising by Taco and the remainder, what is it, one and a half? Right. For local. Right. That was all, was that, let me put it in the form of a question, was that all as a result of a directive of Taco Bell Corporation? Not exactly. It is a result of the directive that is laid out in the marketing fund policy, which is a part of the franchise agreements. So it is a contractual agreement. It is not we require. It's a contractual agreement. That's almost saying the same thing. In other words, in order to get the franchise, Taco Bell dictates the terms, and I assume that one of the, I'm looking at realistically one of the terms that they dictate, if you want a Taco Bell franchise is that you have to contribute to this fund in the percentages that we've already discussed. Am I right or wrong? I think, Your Honor, that's not exactly right, because I don't believe that a franchisee is required to participate in this. So, I mean, we're splitting hairs a little bit, but ultimately it doesn't matter, because payment of funds, someone managing funds for me and saying, well, I'm going to have this agreement with you as to how we're going to manage this money, you pay this amount in, whatever that agreement is, that doesn't make Taco Bell Corp. a legal agent of the association or its members, much less the advertising agency who hired the vendor, who hired the actual person to send the text messages at issue. But Taco Bell, again, they have to approve the program in advance, and then they, in order to be sure that they can ultimately pay it, and then if you don't get the approval in advance, they don't pay for it, and then they ultimately pay for it as they did in this case. And that, to me, although your adversary is focused on apparent authority, that more rings of ratification. And the example that the FCC gave, and I believe they were quoting the restatement, page 14, it's attached to the supplemental brief of the plaintiff. They say, thus a seller may be bound by unauthorized conduct of a telemarketer if the seller is aware of ongoing conduct encompassing numerous acts by the telemarketer and the seller fails to terminate or in some circumstances promotes or celebrates the telemarketer. If that's the standard, I mean, there's also a standard in our case law that at least has to be an agent whose acts are ratified. But let's assume there is an agent whose acts have been ratified. Let's assume there's an agent. Was there ratification under the standard that the FCC adopted? And the answer is no. I think, first, part of what you've identified is that we do have to actually look at the chain of agency here, and that is an issue. But the biggest problem with ratification here is that Thomas, if, well, first, ratification really hasn't been an argument that's ever been advanced. I mean, some of these facts have been discussed, but ratification came up first time in the supplemental briefing. Put that aside, the biggest problem is that she had to show, if she was going to assert a ratification theory, that action was taken purportedly on behalf of Taco Bell Corporation or by Taco Bell Corp., by someone unauthorized to take that action. And then the Taco Bell Corp., with full knowledge of what the unauthorized person had done to bind it, agreed to it. And I want to just talk about that, and I see my time has expired, but if I could finish answering the question. I'm allowed. Thank you, Your Honor. Maybe because I'm allowing him to come up and say something after, but go ahead. The record on this is undisputed, and you have to take a very close look at it. The ballot information that was voted on and approved by the board of directors, I want to set aside for a minute because that's not Taco Bell Corp. If you take a look at the ballot says, and this is an SER 248-249, and I'm talking here about the attachment to the emails where ESW, the advertising agent, sends an email to the members of the Chicago Association and says, attached are the details of how the text-to-win component of the promotion works. If you take a look at what's actually attached there, that's at SER 249, it is describing text messages being sent by a customer to vote. It is not the text component that here's a blast, we're having this promotion. And if you flip to ER 241, that is the email where you will find that Taco Bell approved by brand communications. That's the only place that they could go for ratification here. What was approved, if you look at ER 241 through ER 255, there's no mention there of outgoing text messages. The artwork talks about where you would vote if you're sitting at your Taco Bell table and there's a tray liner that has a text message code, how do you as a customer vote? The rules talk about entrance using text messages and how customers will send a text message. Taco Bell Corp. did not ratify this. They did not have full knowledge of all the material facts. And with that, unless the Court has further questions, we'd ask the Court to affirm the summary judgment. Further questions, Judge Gould? All right. Thank you, Your Honor. You have another 30 seconds, Counselor. Thank you, Your Honor. Because my time is short, I'll limit my discussion to just one thing that my opponent said. Even if the vote at the Chicago DMA went against Taco Bell, the Chicago DMA still could not have proceeded with the campaign without Taco Bell's approval, and, in fact, without Susan Vitti's approval, as the marketing fund policy makes clear. In order to act in any way, the Chicago DMA must get approval from Taco Bell and get approval from three different agencies, three different departments of Taco Bell, one of which is field marketing, which at the time was Susan Vitti. So even if Susan Vitti lost the vote, the marketing fund policy makes clear that this campaign can't happen, that the Chicago DMA can't send it without field marketing, as well as legal and advertising approving it. So even if they lost the vote at the Chicago DMA, it still couldn't have happened without Taco Bell's approval pursuant to the marketing fund policy. And further, even if they tried to do it without Taco Bell's approval, the marketing fund policy also requires that NAFA only release funds if Taco Bell has given those approvals, which it did in this case. So that's – I see that my time is up, if I may finish. You can – well, I've let you go over already, but you've got another 15 seconds. Thank you. Also, the idea that the money in NAFA is the money of the local association is just simply not true. The local association has no money. That money goes directly from Taco Bell-owned stores and franchises into NAFA, and it gets paid directly from NAFA to the vendors. In this case, Taco Bell paid Ipsch directly from NAFA for the text messages that were sent. And it did so after the campaign was over, which, as we discussed in our brief, is a perfect example of ratification. Thank you. Thank you, Your Honor. Do you agree – can I ask one more question? Do you agree that ratification requires knowledge? Yes, and Taco Bell certainly had knowledge, Your Honor. The record makes clear that Taco Bell itself, through Susan Vitti, actually reviewed the text message in this – the text of the text message in this case before it was sent. If you look at the testimony of Jennifer Kallsen, she stated in pretty strong terms that the text message – the text of the text message had to be reviewed and approved by the board, which included Taco Bell or Susan Vitti, before we would ever send it. It had to be reviewed and approved by the board. But that's not Taco Bell. But let me ask you the one – But even if – even if – Let me ask you one last question. The example that's given by the FCC of ratification, thus a seller may be bound by unauthorized conduct of a telemarketer if the seller is aware of ongoing conduct encompassing numerous acts by the telemarketer and the seller fails to terminate or in some circumstances promotes or celebrates the telemarketer. How does your argument hold up against that? I think it holds up – It's in footnote 104 on page 14 of this – I think it holds up just fine. I mean, there were numerous acts that – that if we're talking about FSHR or if we're talking about ESW, there are a number of different acts that each one of them took, and Taco Bell approved every one of them. And then Taco Bell ratified those acts afterwards by paying for them. All right. Thank you. Court has nothing further. I thank the court for its time. Judge Smith, could we take a 10-minute break? You bet we can. Court will be in recess for 10 minutes. Case 12-56458, Thomas v. Taco Bell, is submitted.
judges: Korman, GOULD, SMITH